UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| JASON EDWARD SEARS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:18-CV-234-REW |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| OFFICER RAYMOND BATES II, et al., | ) | |
| | | |
| Defendants. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Jason Edward Sears suffers from seizures that, according to him, cause him to become aggressive and unresponsive. While detained at Pulaski County Detention Center, staff were not aware of his medical condition and responded to his acts of aggression and non-compliance with force. Sears has sued various Defendants[1] in their individual and official capacities alleging excessive force, deliberate indifference to a serious medical condition, and failure to train in violation of 42 U.S.C. § 1983—plus a smattering of state law theories. *See* DE 32 (Amended Complaint). PCDC Defendants move for summary judgment on the individual and official capacity claims[2]. *See* DE 81. Corhealth Solutions, LLC (Corhealth), and Amy Parsons separately pursue Rule 56 relief. *See* DE 84. Plaintiff responded in opposition to both motions. *See* DE 86; DE 87. Defendants replied. *See* DE 90; DE 92. The matter is ripe for consideration.

---

[1] Raymond Bates, II, James E. Pitman, II (Pitman II), Kenneth Sinkhorn, Christopher Keeney, James E. Pitman (Pitman), Ron Swartz, David Moss, and Pulaski County (collectively, PCDC Defendants); Corhealth Solutions, LLC (Corhealth); and Nurse Amy Parsons.

[2] Defendants argue that the claims should be properly categorized as only official capacity claims. DE 81 at 2, 9. In his responses to the summary judgment motions, Sears appears to argue both theories. The Court will address both theories. The amended complaint fairly includes each variant. DE 32 ¶ 23; *id.* at 11–13.

1

## I.     BACKGROUND

On September 10, 2017, Somerset Police Department Officer Matt Brown responded to a 911 dispatch regarding a car striking another vehicle in a McDonald's parking lot. DE 72 (Matt Brown Dep.) at 28.[3] Once Brown arrived, he found Jason Sears in a car that was "pushed up against" another vehicle. Brown Dep. at 28–29. Officer Hunter Nelson arrived shortly thereafter. Brown Dep. at 32. Brown initially believed that Sears was intoxicated. Brown Dep. at 35. The Brown-Nelson-Sears interaction eventually devolved into a physical altercation after which Brown and Nelson arrested Sears.[4] Brown Dep. at 34–46. EMS treated Sears at the scene. EMS's report lists "Seizures" in Sears's medical history but identifies no current medications. DE 81-2 (EMS Report). The EMS narrative stated that Sears admitted to drinking alcohol but that "it was not much." *Id.*

Crucially, there is no proof that EMS provided the report to any Defendant. No record evidence indicates that Sears told Brown or Nelson that he suffered from a seizure. Indeed, Brown did not believe that Sears was suffering from a medical condition of any kind. Brown Dep. at 70. Ultimately, Brown transported Sears, who had facial cuts and some superficial injuries, to the Pulaski County Detention Center.[5] Brown Dep. at 57–58.

During a mandatory intake decontamination shower, Sears, unattended went to the ground. DE 80 (Notice of Conventional Filing); DE 85, Exhibit 1-A-1 ("Personal Property Bath") at

---

[3] The Court's citations track deposition, rather than ECF, pagination.
[4] The Court declines a lengthy recitation of the parking lot events. Audio and video recordings indicate that only one active case Defendant (Pittman II) was aware of the kerfuffle. *See* DE 85, Exhibit 1-B-2 ("SallyPort Inside East") at 2:12:30; *see also* Exhibit 1-B-1 ("IRC Receiving") at 2:13:00. The current record contains no evidence that any other PCDC Defendant (or Corhealth) was privy to the pre-arrest facts during the at-issue period. Plaintiff does not argue and the Court does not perceive any relevant link between viability of the live claims and the McDonald's melee.
[5] Sears alleged claims against Brown and Nelson and other SPD players. The Court dismissed these claims pursuant to a stipulation. *See* DE 65.

2

2:28:14.[6] Officers Raymond Bates and Pitman II went to check on Sears, who was unresponsive to commands. "Personal Property Bath" at 2:28:30; DE 76 (Raymond Bates II Dep.) at 40. He rose and repeatedly tried to exit the shower. Bates and Pitman II used force to keep Sears in the shower. *Id.* at 2:28:55–32:30. Eventually, Sears complied. *Id.* at 2:32:32. Shortly thereafter, Sears was taken to a nurse for evaluation.[7] "Medical Room" at 2:54:39 p.m.

Later that day, Sears required attention in a holding cell. "IRC Cell 117 Facing Door" at 10:58:32 p.m. Officers James Pitman, Christopher Keeney, and Lila Coffman,[8] together with Nurse Amy Parsons, attempted to lift and escort Sears out of the cell. *Id.* at 11:00:02. Pitman and Parsons asked Sears multiple times what was wrong; Sears did not respond. "IRC Short Hall" at 11:00:14. Sears began resisting the officers. *Id.* at 11:00:48. The officers subdued Sears, placed him in handcuffs and, ultimately, a restraint chair. *Id.* at 11:01:25. Sears remained in the restraint chair for approximately one hour before returning to the holding cell. "IRC Main Area" at 12:00:05.[9]

At no time, during either incident, did Sears tell officers that he suffered a recent seizure, that he is epileptic, or that he was on seizure medication. Sears did not wear a medical bracelet or necklace with this information.[10] There is no record proof that Sears advised any PCDC personnel

---

[6] The Court's citations to the DE 85 videos (Exhibits 1-A-1, 1-B-8, 1-B-11, 1-B-12, and 1-B-14) will, hereinafter, adhere to the DE 80 nomenclature. Pincites track the video time stamps.

[7] This nurse is not named as a party and nothing in the record identifies this nurse. Only audio-free surveillance footage documents this interaction. *See* "Medical Room" beginning at 2:54:39 p.m.

[8] Sears advanced claims against Officer Coffman. The Court dismissed those claims pursuant to a joint motion. *See* DE 64; DE 65.

[9] Sears does not allege nor provide any evidence that he suffered harm from either incident. The only alleged harm comes from Sears's treating physician, Dr. Toufic Fakhoury, who vaguely claims that confinement "may" have exacerbated his condition. *See* DE 89–1 at 2. However, the record shows no evidence of such exacerbation.

[10] Medical bracelets and necklaces may be used with patients who have epilepsy. *Epilepsy – Diagnosis and treatment*, Mayo Clinic, https://www.mayoclinic.org/diseases-

at any relevant point that he suffers from epilepsy or required seizure medication. There is no evidence of Sears completing an intake survey or providing any notice to the PCDC of his medical conditions or prescription medication prior to the incidents in question.[11] There is no evidence that any third party told PCDC that Sears has an epileptic condition.[12]

\* \* \* \* \*

Sears filed an amended complaint in this Court against Brown, Nelson, Bates, Pitman II, Sinkhorn, Coffman, Keeney, Pitman, Parsons, Stephens, Brad Stephens, Ron Swartz, David Moss, Corhealth Solutions, LLC, Somerset Police Department, City of Somerset, and Pulaski County. DE 32. His complaint alleges federal civil rights violations and related state law tort claims. *See id.*

After a series of pre-trial motions, only a select number of Defendants and claims remain. The Court dismissed the count against the City of Somerset pursuant to an agreed order. DE 64. The Court dismissed the counts against Brown, Nelson, Stephens, and the Somerset Police Department pursuant to the parties' stipulation. DE 65. The Court dismissed the count against Lila Coffman pursuant to a joint motion. DE 94; DE 95. The remaining counts include: Count IV and V against Bates and Pitman II in their individual and official capacities for § 1983 excessive force, battery (nominally), and negligence; Count VI against Sinkhorn in his individual and official capacities for § 1983 failure to intervene; Count VII against Keeney and Pitman in their individual

---

conditions/epilepsy/diagnosis-treatment/drc-20350098 (last visited Aug. 25, 2020) ("Wear a medical alert bracelet. This will help emergency personnel know how to treat you correctly.").

[11] Sears notes that one of his expert witnesses, William Harmening, questions a survey that was signed a day later and lists his medications. *See* DE 89 at 3; DE 51–1 at 10. Plaintiff filed no such survey.

[12] The unverified amended complaint claims that Sears's sister, Joni Winterland, called the PCDC after Sears was arrested to warn the jail of Sears's condition. DE 32 at ¶ 7. Plaintiff produced no supportive proof, and Sears does not rely on this wholly unsubstantiated allegation in his briefing.

and official capacities for § 1983 excessive force and negligence; Count VIII against Parsons in her individual capacity for deliberate indifference to a serious medical condition (as briefed, at least), negligence, assault, and intentional infliction of emotional distress; Count X against Swartz in his individual and official capacities for negligence and supervisory liability; Count XI against Moss in his individual and official capacities for negligence and supervisory liability; Count XII against Corhealth Solutions, LLC for negligence; and Count XV against Pulaski County for negligence and deliberate indifference.[13]

Before the Court are Defendants' motions for summary judgment (DE 81; DE 84). Both are fully briefed and ripe for review.[14]

## II.   STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the movant to set forth "the basis for its motion, and identify[] those portions of 'the pleadings,

---

[13] There is no Count XIII in the operative pleading. *See* DE 32.
[14] Defendants' motions to exclude expert testimony (DE 82; DE 83), and Plaintiff's motion for leave to file a supporting affidavit (DE 97) are also before the Court. This order moots the two motions to exclude and the motion for leave to file supporting affidavit.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'
which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d
at 414 ("The party moving for summary judgment bears the initial burden of showing that there is
no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the
nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*,
106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c)
mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient
to establish the existence of an element essential to that party's case, and on which that party will
bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan,
J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party
moving for summary judgment may satisfy Rule 56's burden of production in either of two ways.
First, the moving party may submit affirmative evidence that negates an essential element of the
nonmoving party's claim. Second, the moving party may demonstrate to the Court that the
nonmoving party's evidence is insufficient to establish an essential element of the nonmoving
party's claim." (emphasis in original)).

  A fact is "material" if the underlying substantive law identifies the fact as critical.
*Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of
the suit under the governing law will properly preclude the entry of summary judgment. Factual
disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if
"there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that
party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could
not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for

trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

In *Matsushita*, 106 S. Ct. at 1356, the Supreme Court "authorized an inquiry on summary judgment into the implausibility of inferences from circumstantial evidence, not an inquiry into the credibility of direct evidence." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994) (internal quotation marks and alterations omitted) (interpreting *Matsushita*). Put differently, it is "error for [a] district court to resolve credibility issues against the nonmovant[.]" *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).

## III.   ANALYSIS

### A.  Federal Claims

#### 1. § 1983 Excessive Force (Counts IV, V, and VII)

The PCDC Defendants argue that, at all relevant times, the force used against Sears was reasonable in light of Sears's actions and the facts confronting the officers. DE 81 at 12–13, 15. Sears contends that use of any force was excessive and unreasonable under both the Fourth and Fourteenth Amendments.[15] The crux of Sears's theory is that he was suffering from seizures during each relevant sequence and any use of force was unreasonable. He adds that Defendants' subjective knowledge of his condition is irrelevant because each should have recognized and known Sears's actions to be the postictal effects of a seizure. DE 86 at 6–8. Further, Sears argues that his condition alone made him incapable of being combative, non-compliant, or resistant. *Id.* at 8–9.

---

[15] At least, the Fourth Amendment is a normal wellspring for an excessive force theory. Frankly, the amended complaint is a confusing amalgam of blended concepts. Counts IV, V, and VII sound in excessive force, but textually, the claims cite the Eighth Amendment and really are that the Defendants negligently failed to perceive Sears's medical condition, thus misperceiving the scenario and "resulting in excessive and unreasonable force" being used against him. DE 32, ¶ 23. The Court does its best to discern and apply the proper tests to this atypical claim formulation.

The standard for excessive force claims turn on the "plaintiff's status at the time of the incident: a free citizen in the process of being arrested or seized; a convicted prisoner; or someone in 'gray area[s]' around the two." *Coley v. Luas County, Ohio*, 799 F.3d 530, 537 (6th Cir. 2015) (citing *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013); *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002)). A pretrial detainee's excessive force claims trigger the objective reasonableness standard of the Fourteenth Amendment. *Id.* at 538 (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)). *Kingsley* blurred the lines between Fourth and Fourteenth Amendment analysis of pretrial detainees' excessive-force claims. *See Hanson v. Madison County Detention Center*, 736 F. App'x 521, 528 nn. 3-4 (6th Cir. 2018). Regardless, Sears's excessive force claims "are governed by an objective reasonableness standard." *Id.* at 528 (citing *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010). *Kingsley* enumerates the considerations that bear on objective reasonableness:

> [1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting.

135 S.Ct. at 2473.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 109 S. Ct. 1865, 1872 (1989).[16] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances

---

[16] The officers' particular knowledge at the time of force application provides the specific context. "Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*, 121 S. Ct. 2151, 2159 (2001).

that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Smith v. Freland*, 954 F.2d 343, 346–47 (6th Cir. 1992) (quoting *Graham*, 109 S. Ct. at 1872). The Court must also "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in the[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 135 S.Ct. at 2468 (quoting *Bell v. Wolfish*, 99 S. Ct. 1861 (1979)).

A few preliminary observations:  First, regarding the second *Kingsley* consideration, Sears does not point to a discrete harm stemming from any particular use of force.  Dr. Fakhoury, by letter,[17] states that "[Sears's] symptoms may have been exacerbated by confrontation and attempts at restriction of movement." DE 89–1 at 2. However, Dr. Fakhoury does not opine that any Defendant's conduct in fact worsened Sears's condition. No record evidence supports Fakhoury's tentative conjecture as a matter of case reality. In fact, as Defendants correctly point out, Sears's interrogatories claimed that his injuries were scrapes, bruises, and abrasions. DE 81–4 at 2. Sears himself contends that only non-specific portions of his alleged injuries are attributable to the remaining Defendants. *See* DE 69 (Jason Sears Dep.) at 66–67. Each healed in short order.[18] Sears admits that he does not have any permanent injuries from the jail events; he does not establish exacerbation of his epilepsy or related symptoms. DE 69 at 90. Importantly, he ties no harm to the

---

[17] This unverified document does not pass Rule 56's consideration gate. *See* Fed. R. Civ. P. 56(c)(1), (4). The Court, as to Dr. Fakhoury, further notes that he does not couch his views in terms of reasonable medical probability. That is a typical requirement for medical opinion. *See Fulcher v. United States*, 88 F. Supp. 3d 763, 771 (W.D. Ky. 2015) ("A plaintiff must prove medical causation by a reasonable medical probability by using expert medical testimony."). The unverified and conclusory letter is the slenderest of reeds for Sears's theories.

[18] In deposition, Sears claims that the injuries sustained during the arrest healed after "about a week." Sears Dep. at 86. The injuries he alleged he sustained in jail healed within "three to four days." *Id.* at 90.

conduct of any particular actor. *Cf. Pineda v. Hamilton Cty., Ohio*, --- F.3d ---, 2020 WL 5868402, at *5 (6th Cir. Oct. 2, 2020) (affirming district court's grant of summary judgment where the plaintiff had not "presented evidence from which a reasonable jury could conclude that it is 'more likely than not' that any specific defendant struck him" (quoting *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1073 (6th Cir. 1993))); *see* DE 81-4, Sears interrogatory response 4 ("I do not know specifically which Defendant attributed to which injuries.").Second, the record does not support Plaintiff's contention, in either of the subject incidents, that his condition was self-evident. Sears argues that the video evidence of both episodes presents clear proof that he seized and was suffering from the postictal effects of a seizure. DE 86 at 6. Thus, Sears argues, his every action is explainable through and attributable to epilepsy. However, Sears provides no proof indicating that the officers knew Sears's epileptic history. Sears's conclusory interpretation of the video is not, itself, evidence.  Real time video evidence can provide omniscient insights into events happening outside the eyes of officers. This lens, however, is one the Court must avoid when analyzing the reasonableness of the officer's actions. *See Graham*, 490 U.S. at 197 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances *confronting* them . . . ." (citation removed) (emphasis added)).

Third, Sears has disavowed any direct personal knowledge or memory of the events in question. *See* Sears Dep. at 35. Sears's deposition testimony is merely his viewing of the video evidence. [19] *See id.*  Thus, he can offer naught but lay opinion, based on his own video review, regarding the events in the jail. *Cf.* Fed. R. Evid. 602 (requiring "personal knowledge of the

---

[19] "Q: Let me ask you, do you have any memory outside the video though?" "A. Oh, no, no." "Q: Okay. So what you would testify if you were, it would be about what you've seen on the video?" "A: Correct."; *See also* Sears Dep. at 117 ("All I remember is walking into the shower. I don't remember what happened in the shower, just from what I saw on the DVD.")

matter"). *But see* Fed. R. Evid. 701 (requiring lay opinion testimony be "helpful"). In contrast, Bates, Pitman II, Pitman, and Keeney testify to direct, personal knowledge of the events in question. Further, the Court must adjust its viewpoint if video evidence "clearly contradicts" the non-movant's narrative. *Ayala v. Hogsten*, 786 F. App'x 590, 591 (6th Cir. 2019). In such circumstances, the Court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). For events not depicted on film, or those fairly subject to varying inferences, the Court's obligation to adopt Sears-favorable interpretations persists. *See Ayala*, 786 F. App'x at 592.

With those observations in mind, the Court turns to the alleged excessive force claims, which center on two distinct interactions. The Court conducts the "segmented analysis" as precedent dictates and applies the *Kingsley* considerations. *See Morrison v. Bd. Of Trs.*, 583 F.3d 394, 401 (6th Cir. 2009) ("A reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions."); *Kingsley*, 135 S. Ct. at 2473. The inquiry evaluates the uses of force in the "Personal Property Shower" and the uses of force in the hallway outside of the holding cell. The totality modifies all, but the Court sequentially scrutinizes each episode of force application.[20]

### The Personal Property Shower Incident (Counts IV and V)

The PCDC Defendants claim that Bates and Pitman II were reasonable in their use of force when Sears was non-compliant and resistant against orders to remain in the decontamination shower. Sears, on the other hand, blames Bates and Pitman II for not recognizing the presence and

---

[20] "This approach requires [a reviewing court] to evaluate the use of force by focusing on the 'split-second judgment' made immediately before the officer used allegedly excessive force, not on the poor planning or bad tactics that might have created the circumstances that led to the use of force." *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quotation marks and citation omitted).

effects of a seizure. Their lack of discernment, according to Sears, led directly to the complained of harm, *i.e.*, that any reasonable officer would have known Sears was suffering from the postictal effects of a seizure and that any use of force in that circumstance would be excessive. Furthermore, Sears claims the force used was itself unreasonable and excessive.

Video evidence provides a near complete picture of what happened in the shower room.[21] When Sears entered the shower, he appeared to be interacting with the officers in a conversational manner. After a brief exchange with Pitman II, both officers are absent from the room when Sears appears to collapse in the shower.[22] "Personal Property Bath" at 2:28:04–14. Shortly thereafter, Pitman II and Bates re-enter the room. *Id.* at 2:28:22. Bates removes the shower curtain, and he and Pitman II both stand at the edge of the shower. *Id.* at 2:28:30. Bates testified that as he was getting up, Sears appeared to be pushing outward against Bates. DE 76, Bates Dep. at 40. Bates testifies that Sears claimed he was "done" and that he was going to get out while Bates was telling him to remain in the shower. *Id.* Throughout this time, Sears repeatedly attempts to step outside of the shower. "Personal Property Bath" at 2:28:55– 29:12. Pitman II then discharges OC pepper spray onto Sears after repeated attempts by Sears to leave. *Id.* at 2:29:17. Sears then repeatedly tries to leave the shower while Bates uses the shower curtain as "defense" to keep Sears in the shower. Bates Dep. at 42–43.

---

[21] There is no audio for this surveillance video.

[22] Dr. Fakhoury, again only by letter, opines that Sears suffered from "at least one additional seizures [sic] during incarceration in the shower characterized by loss of awareness and unresponsiveness." DE 89–1 at 2. Perhaps, given the history, assuming some consideration of Fakhoury's view, and receiving the videos in the best light for Sears, there is a question over the fact of seizure at the jail. Again, however, the case focuses on what the jail employees knew or should have known and how they acted in relation to Sears. The relevant inquiry is whether the officers' use of force was objectively reasonable given the information they had.

Sears then turns, extends an arm, and pushes against the officers while attempting to leave the shower. "Personal Property Bath" at 2:29:20. Pitman II then kicks the back of Sears's leg in an effort to compress a pressure point. *Id.* at 2:29:25; DE 75 (James Pitman II Dep.) at 19–21. Pitman II testified that he learned this technique through pressure point training, a strategy intended to prevent suspects from advancing forward. *Id.* After Sears returned to his feet (without assistance), Bates then pushes Sears back into the shower. "Personal Property Shower" at 2:29:35–2:29:44. Bates then shoves Sears and, according to Bates, his hand slips due to the soap on Sears's body. *Id.* at 2:29:45; Bates Dep. at 48–49. Sears calls this use of force a "throat punch." *See* DE 86 at 6. Bates then repeats this action but with his fingers extended. *Id.* at 2:29:50. Sears tries to exit several more times and Bates thwarts him by repeating the same finger extended push. *Id.* at 2:29:51–32:00. Sears eventually stops attempting to exit and remains in the shower.[23] *Id.* at 2:32:21. Sears completes the shower and within minutes sees a nurse. *Id.* at 2:36:46; "Medical Room" at 2:54:39.

As to each application of force, Defendants argue that Sears was non-compliant, resisting commands, and actively struggling against the officers. While Sears notes that all uses of force were unreasonable, he takes special issue with four applications: the use of OC pepper spray, the kick to Sears's leg, the use of the shower curtain to push Sears back, and alleged "throat punches." However, the video evidence, along with uncontradicted deposition testimony, in fact shows Sears was actively resisting the commands of the officers while advancing against or disobeying the officers. Active resistance includes "physically struggling with, threatening, or disobeying officers." *Rudlaff v. Gillespie*, 791 F.3d 638, 641–42 (6th Cir. 2015). Given the circumstances the

---

[23] There are several de minimis uses of force including swatting Sears's hand away from the officers and holding Sears in the corner of the shower.

officers confronted, no reasonable juror could find that the force used against Sears was unreasonable.

The fourth *Kingsley* consideration—the "severity of the security problem"— consistently favors a reasonableness finding for each force application during the shower incident. The decontamination shower mandate, unassailed by Plaintiff, aims to ensure that the detainee does not bring in any dangerous chemicals, infections, or other parasites. *See* DE 77 (Kenneth Sinkhorn Dep.) at 12. ("We still run people through the shower decontamination no matter when they come in. . . . Because we have the medicated soap to kill body lice and prevent staph infection. You know it's all, it's all part of the shower process."). The effectiveness of this security measure depends on the detainee completing the shower. *See* DE 76, Bates Dep. at 55 ("At that point in time if he comes out he's going to contaminate the chair he sits in and anybody that gets close to him. . . . And then if somebody else touches that that's, that has the adverse effect to it that hurts them and they get that in their eye then we've got another issue there."); *id.* at 27 (describing policy); *cf. Murphy v. Ott*, Case No.: GJH-16-3092, 2018 WL 1513007, at *7 (D. Md. Mar. 26, 2018) (refusing summary judgment where plaintiff claimed refusal to provide a decontamination shower while "still suffering from pepper spray" violated the Eighth Amendment). Thus, to maintain the integrity of this process, justified by legitimate institutional safety concerns, some level of force was justified to ensure completion of the policy-based decontamination.

First, Bates's use of the shower curtain was an objectively reasonable, *de minimis*, use of force. Bates simply employed the shower curtain to block Sears's attempt to exit the shower and to push Sears back in. *See* Bates Dep. at 42. Sears grabbed on the curtain, pushed against the curtain, and eventually advanced towards Bates. *See* "Personal Property Bath" at 2:28:55-29-12. Generally, "correctional officers do not violate an inmate's constitutional rights merely by using

14

force to gain compliance with their commands." *Begley v. Tyree*, No. 6:14-cv-191-KKC-EBA, 2016 WL 11432530, *4 (E. D. Ky. Sep. 14, 2016).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 109 S. Ct. at 1872 (quoting *Johnson v. Glick*, 481 F2.d 1028, 1033 (2nd Cir. 1973)). PCDC has an interest in limiting unruliness and ensuring decontamination. Bates's shove with a shower curtain, which produced no injury, is certainly a *de minimis* use of force that does not cross the constitutional threshold. *Cf. Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178 (2010) ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." (quoting *Hudson v. McMillian*, 112 S. Ct. 995, 1000(1992)).  In light of the uncontroverted facts confronting Bates, the force used was objectively reasonable.

Second, Pitman II's use of OC pepper spray was objectively reasonable. As the Defendants correctly point out, the Circuit has not held that using OC pepper spray is *per se* unreasonable. *See Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002); *see also Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir. 1994). Sears argues that Pitman II used the spray "several times." DE 86 at 7.  The evidence simply does not support this claim. The video clearly shows one use of spray; the OC contains a dye that facilitates observation. *See* "Personal Property Bath" at 2:29:17; Bates Dep. at 54 ("The reason they put the dye in it is so that you can see it."). Neither deposition testimony nor the incident report indicates a subsequent use. *See, e.g.,* Pitman II Dep. at 23-26, 30 (discussing Pitman II pointing the pepper spray at Sears but not that Pitman II used the pepper spray again); DE 86–1 (Pitman II Incident Report). The limited force used was objectively reasonable considering Sears's non-compliance. *Cf. Lamb v. Telle*, No. 5:12-CV-00070-TBR, 2013 WL 5970422, *6-*7 (W. D. Ky. Nov. 8, 2013) (denying summary judgment when the Defendant

deployed and/or rubbed in pepper spray five times and the Plaintiff felt its effects over two months later).

Third, the use of the Pressure Point Control Technique (PPCT) kick by Pitman II was objectively reasonable. Pitman II underwent PPCT courses as part of his jail training. Pitman II Dep. at 7. The specific technique used was the peroneal strike in which the officer applies pressure to the common peroneal region of the leg, which causes the detainee to buckle.[24] William Harmening, Sears's use of force expert, opines that the technique was never "proper in that context" and that he has never seen officers trained to use such force.[25] DE 70 (William Harmening Dep.) at 97. However, in light of Pitman II's training and the situation he faced, use of the technique was reasonable. Sears pushes against Bates and the shower curtain in the moments before the kick.[26] "Personal Property Bath" at 2:29:21–24. Shortly after the kick, Sears was able to stand up on his own and continued to try to exit. "Personal Property Bath" at 2:29:35. A detainee advancing against an officer certainly poses an "immediate threat to the safety of the officers or others[.]" *Graham*, 109 S. Ct. at 1872. Further, the use of the peroneal nerve strike is not, as a matter of law, an unreasonable use of force. *See Bennett v. Britton*, 609 F. App'x 11, 13-14 (2d Cir. 2015) (holding that an officer's use of the peroneal nerve strike to protect another officer "was an objectively reasonable and proportionate response to [Plaintiff]'s violent behavior"). Moreover,

---

[24] "It's called the common peroneal. . . . It's on the bottom of the thigh. . . . That's how we are taught to apply pressure to stop forward movement." Pitman II Dep. at 19–20.

[25] Mr. Harmening offers no opinion on whether the officers failed to meet training requirements. *See* Harmening Dep. at 85. Furthermore, Mr. Harmening's report and deposition does not recognize or discuss the Pressure Point Control Technique training Pitman II described; he simply refers to it as a kick to the leg. *See* Harmening Dep. at 96–97; DE 51–1 at 16.

[26] Pitman II believed that the technique, used once, without injury, and to effect, was necessary to stop the advancing Sears. *See* Pitman II Dep. at 20 ("I wanted to stop his momentum. I didn't want him to push my Sargent back any further.") Pitman II's "split-second judgment" should be given weight when evaluating the circumstances, he encountered. *Graham*, 109 S. Ct. at 1872.

Sears does not claim and provides no proof to substantiate "the extent of [his] injury." *See Kingsley*, 135 S. Ct. at 2473. In fact, Sears admits that he has no damage to his leg and that all harms quickly resolved. Given the preceding events (and the lack of deterrent impact), it was undoubtedly reasonable for an officer in the circumstances to conclude that additional force was required to halt Sears's attempts to advance on Bates and/or to exit the shower.

Fourth, Bates's use of force to keep Sears in the shower was objectively reasonable. Bates is seen on video repeatedly using his hand to push or redirect Sears back into the shower. The first use of force of this kind resulted in his hand slipping up to Sears's throat.[27] Bates then uses a different technique to keep Sears in the shower; he described this technique in deposition as involving a clavicle notch. Bates Dep. at 49–50 ("The clavicle notch, if somebody is leaning out towards you[,] you can take that, push downwards and instead of having to physically get real rough with them you just push down on that pressure point right there and it will cause them to drop and step back away from you."). The mere fact that there was incidental throat contact does not convert Bates's otherwise *de minimis* use of force into unreasonable excessive force. Bates's use of force to keep Sears in the shower was objectively reasonable. The video does not bear the characterizations Plaintiff argues—there was no throat punch and certainly no repeated punches. Again, the tape tells the tale. The only descriptions—what was said, the demeanor, the climate— come under oath from the jail employees. A reasonable jury could not deem the officers' handling objectively unreasonable in this context. Sears required decontamination, and he was resistant to

---

[27] Sears argues that the video evidence clearly shows that Bates was targeting his throat. Viewing the video frame by frame shows that Bates's open hand made contact with Sears's chest before slipping to Sears's throat without ever grasping. *See* "Personal Property Bath" at 2:29:45. In any event, the moniker assigned to the use of force is irrelevant to the inquiry: Was the force used reasonable?

the event. Officers used minimal and non-injurious force to accomplish the legitimate objective and to maintain control of a rowdy (and slippery) detainee.

Of course, the lynchpin, to Plaintiff, is that the officers "negligently failed to identify a medical emergency," DE 32, ¶ 23, *i.e.*, Sears's seizure condition and postictal status. Thus, by manhandling the compromised Sears, the officers misperceived the state of the incident and were wrong to have used force.

The problem is the predicate. Nothing in the record indicates that any jail employee knew of Sears's history. Nothing fairly suggests that the officers should have known about any seizure involvement. That Sears went to the ground in the shower is not fair notice to the lay jailers. Indeed, Sears promptly got back to his feet unaided, and was communicative throughout the event. Further, after the shower, the jail nurse promptly saw Sears. Again, this produced no documented indication or perception of seizure involvement. Sears offers nothing—no expert or other proof—to establish that jail personnel should have perceived a medical problem that would have altered their approach. The officers simply dealt with a detainee who would not cooperate in the mandatory decontamination protocol. The officers did not hurt Sears, but they did coerce his compliance by making him stay in and complete the shower. In this context, the close quarters of a jail shower and pursuit of a legitimate penological concern, no reasonable jury would find the officers' decisions excessive.

*The IRC Short Hall Incident (Count VII)*

Next, the events following Sears's incident in the holding cell. The PCDC Defendants argue that Sears's active resistance and attempts to pull away from the officers justified Pitman and Keeney's use of force in the hallway. *See* DE 81 at 15. Sears counters that, at no time, was he combative, aggressive, or resistant. *See* DE 86 at 8. Furthermore, Sears argues that his behavior

18

during this incident is consistent with the postictal effects of a seizure and, thus, there was no conduct or danger presented to the officers that required force. *See id.*

Again, video evidence clearly depicts the entire incident. The episode begins with Sears in his cell.[28] "IRC Cell 117 Facing Door" at 10:57:29. Per the tapes: Sears begins touching another inmate's foot and pulls at the same inmate's blanket. *Id.* at 10:58:07. The other inmate appears agitated at Sears's actions. *Id.* at 10:58:27. Sears, seated, then tips onto another inmate's head and continues to pull and tug at the bedding. *Id.* at 10:58:32. The agitated inmate goes to the cell door and calls for a guard. *Id.*

Officer Pitman appears at the cell window to inquire about the issue. *Id.* at 10:59:14. Pitman enters the cell and begins questioning Sears. *Id.* at 10:59:31. Sears does not answer. *Id.* at 10:59:35. Pitman then asks Sears to sit up and attempts to help him up. *Id.* at 10:59:49. At this point, Nurse Parsons and Officer Keeney enter the cell. *Id.* at 10:59:48. Keeney, Pitman, and Parsons then raise Sears to his feet and escort him out of the cell. *Id.* at 11:00:00.

In the hallway, Defendants ask Sears, multiple times, to respond to the Defendants' inquiries about what was wrong. "IRC Short Hall" at 11:00:10-35. [29] Pitman twice admonishes Sears not to pull away. *Id.* at 11:00:07, 11:00:30. Sears then struggles with the officers and the officers pin him up against the wall. *Id.* at 11:00:52. Sears then raises his leg up and appears to use it as leverage against the officers. *Id.* at 11:00:57. One officer commands Sears to lower his leg. *Id.* The officers then struggle to pull Sears away from the wall. *Id.* at 11:01:02. Eventually, they subdue Sears using a leg-sweep to take him to the ground; they then handcuff him. *Id.* at 11:01:25.

---

[28] The "IRC Short Hall" video is the only source of audio during this incident. If there is a reference to audio, the corresponding timestamp in the other video feeds provides the location of the audio in the "IRC Short Hall" footage.

[29] *Id.* ("What's the matter?") ("What are you doing?") ("What's going on with you?") ("Talk to me man.") ("Listen. Right here. Look at me.") ("What's the matter? Talk to us.").

It is fair to say that Sears was loud, complaining, profane, and belligerent in the short trip down the short hall.

Officers then take the cuffed Sears and place him in a restraint chair. *Id.* at 11:02:00. The questioning continues, and Sears, for the first time, verbally responds that his legs are hurting. *Id.* at 11:02:00 (Pitman: "What's the matter?" Sears: "My legs are killing me." Pitman: "What happened?" Sears: "My legs are hurting me."). While the officers attempt to restrain him in the chair, Sears kicks at Officer Coffman—who joined the escorting trio after Sears was pushed into the wall—three times. "IRC Main Area" at 11:02:13, 11:02:15, 11:02:16. Parsons tells Sears to stop kicking or that she will "stand on it." *Id.* at 11:02:16. Sears remains restrained in the restraint chair for almost an hour before being returned to the cell. *Id.* at 12:00:10.

Sears takes issue with the entire incident, but fails to grapple with the reasonableness of any specific use of force. DE 86 at 8. As with the shower fracas, he argues that review of the videos shows behavior consistent with the symptoms of a seizure, that Sears was incapable of responding to the officer's request, and concludes that each application of force was therefore unreasonable. DE 86 at 8–9. Sears's argument, however, again conflates video evidence as the vision officers had in the moments leading up to and during the confrontation. On the other hand, Sears's outward behavior was wholly consistent with a recalcitrant inmate.

The initial use of force in pinning Sears to the wall was objectively reasonable. Sears was unresponsive to the Defendants' questions and began to actively resist. *See Hanson*, 736 F. App'x at 530-32 (holding a shove into the wall as being objectively reasonable where the plaintiff "profanely argued with deputies; refused to cooperate and answer basic intake questions; . . . [and] verbally refused to obey an officer's command"). When Sears was against the wall, he pushed his

leg against the wall and refused commands to drop his leg; *i.e.*, adopted a "combative or aggressive stance[.]" *Id.* at 530.

Furthermore, taking Sears to the floor with a leg-sweep technique was not excessive. *See Griffin v. Hardrick*, 604 F.3d 949, 954–55 (6th Cir. 2010). In *Griffin*, the detainee was attempting to pull away from jail officials and was non-compliant as to the officers' instructions. *Id.* at 951– 52.[30] The jail officials then employed a "leg-sweep maneuver" to subdue the detainee. *Id.* at 952. The Court, on review of video evidence, held that this technique, in the context of a resisting and non-compliant detainee, was not "undertaken . . . in a wanton manner, but [the officer] was acting as he was trained while attempting to gain control of [the defendant]." As with the shower leg strike, this was reasonable.

The same technique in *Griffin*, and within a similar circumstance involving a refractory detainee, was used here against Sears. Sears had been non-responsive to multiple questions, pulling away from officers, and otherwise actively resisting. Even after Sears was handcuffed and pulled up from the floor, he continued to resist, kicking and pulling against the officers' attempts to restrain him. At no point did the officers elevate the force when not met with like resistance from Sears. He was profane, demanding, and losing control. The officers' actions to gain control of Sears were objectively reasonable.[31]

---

[30] "Griffin began to walk away from Hardrick, who then reached out to take her right arm. Griffin attempted to jerk her arm away, but Hardrick maintained his grip, and Rutledge stepped in to take Griffin's left arm. After a second or two of struggling with Griffin outside the nurse's station, Hardrick and Rutledge began to escort her down the hallway, which she resisted. Hardrick then stuck out his leg to trip Griffin. At this point, Griffin fell to the floor, and Rutledge tumbled on top of her." *Griffin*, 604 F.3d at 952.

[31] Sears tries to track *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008), but the Court sees many distinctions. In *Lawler*, the officer arguably "crossed the line from subduing an individual to assaulting him." *Id.* After all, the defendant there took the plaintiff to the ground after a testy back and forth, was on top of him, and proceeded to impose "serial strikes" resulting in a broken arm for the plaintiff. Here, by contrast, the officers faced (in separate incidents) a non-

Finally, the restraining Sears in the restraint chair for almost an hour was clearly reasonable in light of the circumstances. The officers restrained Sears after he was unresponsive to questions, refused commands, and was becoming increasingly resistant. Moreover, while restrained, he attempted to kick at the officers restraining him. The use of the restraint chair, under the circumstances, was objectively reasonable and no reasonable jury could find otherwise. *Cf. Hanson*, 736 F. App'x at 533 (holding that plaintiff's three-hour restraint in chair after being actively resistant did not "violate[] clearly established law").

The cell interaction required intervention by jail personnel. As they worked hard to discern the problem, Sears did not cooperate, and he affirmatively refused verbal and physical orientation. He cursed, acted imperious, and would not obey commands. Jail personnel simply controlled him and safely placed him in the restraint chair. Sears alleges (and certainly shows) no injury from the brief hallway events. No jury could find this a constitutional violation. As with the shower matter, nothing known to the officers did or should have cued them to an underlying medical issue.

### *Qualified Immunity*

"Generally, summary judgment based on qualified immunity is proper if the officer was not on notice that his conduct was clearly unlawful." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009). "Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz*, 641 F.3d at 750. Qualified immunity involves a two-part inquiry: "First, taken in the light

---

compliant detainee thwarting institutional rules and never elevated force beyond that rationally designed to effect compliance. The force ceased when the compliance began, when the authorities reasonably neutralized the unruly threat; the force caused no injury of significance or duration to Sears.

most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see Pearson*, 129 S. Ct. at 818 (holding that courts may address the two questions in either order).

"The right must have been 'clearly established' not just in an abstract sense, but in a 'particularized' sense." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997). A plaintiff must show, "on a fact-specific, case-by-case basis . . . [that] a reasonable official in the defendants' position could [not] have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Pray v. City of Sandusky*, 49 F.3d 1154, 1157–58 (6th Cir. 1995). "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate. This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations removed).

Here, because no reasonable juror could conclude that any of Bates, Pitman II, Keeney, or Pitman were objectively unreasonable in their use of force, the qualified immunity analysis need proceed no further.[32] The Court finds no triable issue as to any use of force; the PCDC officers did not violate Sears's Fourth Amendment or other constitutional rights. Finding no constitutional

---

[32] Sears obliquely argues a wholly novel theory in his response to the Corhealth and Parsons motion for summary judgment. Sears states that the fact that he was suffering from a seizure alone made any reasonable use of force excessive. DE 89 at 7. ("The video evidence shows that Plaintiff was having a seizure, was disoriented, and unable to comply with the officers. Nurse Parsons not only failed to recognize that the Plaintiff was experiencing a seizure, she told the officers she would stand on the Plaintiff's leg. *Since any use of force was unreasonable*, this could only amount to punishment . . . ." (citations removed) (emphasis added)). Sears provides no law to support this theory, and the Court has found none. Sears marshals no law to support implicating Parsons or Corhealth in a theory of this type. Further, the complaint does not effectively allege any constitutional theory against the health-care parties named in the case.

violation, the Court finds summary judgment in favor of the Defendants appropriate for Counts IV, V, and VII. As will be explained below in further detail, Sears largely uses his excessive force claims as the cornerstone for the balance of his federal claims. Thus, the failure of this claim is a falling domino that takes out Plaintiff's other § 1983 theories.

### 2. § 1983 Failure to Intervene (Count VI)

Sears argues that Sinkhorn failed to intervene during the shower incident and that Sinkhorn did nothing to stop the use of force against him. DE 86 at 8. Sinkhorn argues that he came in after the incident had started and had no indication of a constitutionally deficient use of force. DE 81 at 14. To establish a claim for § 1983 failure to intervene, a plaintiff must show that the defendant "observed or had reason to know that [constitutional harm] would be or was [taking place], and (2) . . . had both the opportunity and the means to prevent the harm from occurring." *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (internal quotation omitted). Here, Sinkhorn had no duty to intervene or prevent a harm when no constitutional violation occurred. Therefore, summary judgment in favor of Sinkhorn on Count VI is appropriate.

### 3. § 1983 Serious Medical Need Claim (Count VIII)

Sears alleges that Parsons failed to address a serious medical need and thus violated his constitutional right to medical treatment. DE 89 at 7. Parsons argues that Sears has not provided sufficient evidence to satisfy the claim's stringent knowledge requirements. DE 84 at 7. The parties' arguments, however, disagree on the standard to be applied to this claim. Sears argues that the objectiveness standard of the Fourth Amendment should be used when a pre-trial detainee is denied treatment for a serious medical. DE 89 at 4. Parsons disagrees, citing a lack of controlling authority in the Sixth Circuit supporting Sears's strict position and the Circuit's continuing abstention on the matter. DE 84 at 6.

The Court has significant conceptual problems with the arguments in the context of the complaint itself. Plaintiff's claim against Parsons sounds only in state law: Count VIII: Negligence; Assault; Intentional Infliction of Emotional Distress. DE 32. The pleading avers: "Defendant, Amy Parsons . . . negligently failed to identify a medical emergency, when the Plaintiff began suffering a partial complex seizure, while in his cell." *Id.* at ¶ 39. Later, "[t]he negligence of the Defendant to identify the Plaintiff's medical needs . . . resulted in" asserted violations (mainly, force used by others). In other words, Sears claims that Parsons was negligent in her role as nurse, that her only intentional act was a threat made during the course of restraint, and that Parsons's negligence contributed to force applications by others. The parties treat this as a typical medical care deprivation case, but the Court sees, as relevant, only a claim of negligence by Parsons allegedly facilitating constitutional wrongs by others. Negligence will not support a constitutional claim under § 1983. *See Griffith v. Franklin Cty., Kentucky*, No. 19-5378, 2020 WL 5627106, at *10 (6th Cir. Sept. 21, 2020) ("And '[w]hatever *Kingsley* requires, it is more than negligence.'" (quoting *Martin v. Warren County*, 799 F. App'x 329, 338 n.4 (6th Cir. 2020))); *County of Sacramento v. Lewis*, 118 S. Ct. 1708, ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). From this foundation, the Court sees no basis for the claim to go forward, but evaluates the parties' argumentation as presented.

The Circuit has hinted that the excessive force ruling in *Kingsley* may in fact modify the subjective element of a deliberate indifference claim. *Beck v. Hamblen Cty., Tenn.*, 969 F.3d 592, 601 (6th Cir. 2020). The Circuit, however, has decline the opportunity to rule on that case's effects. *Id.* ("We have yet to resolve this question."); *see also Griffith*, 2020 WL 5627106, at *10 ("We agree that Griffith cannot prevail under either test, and therefore reserve the question for another

day."). The Court, at this time, sees no reason to determine the correct standard. As the Sixth Circuit has pointed out, if a plaintiff cannot satisfy the more lenient objective requirements of the Fourth Amendment standard, he would also fail the Eight Amendment subjective analysis. *Esch v. Cty of Kent*, 699 F. App'x 509, 515. (6th Cir. 2017) ("We will therefore assume *arguendo* that the Fourth Amendment's more forgiving objective reasonableness standard governs this appeal, because 'behavior that does not rise to the level of a Fourth Amendment violation cannot offend the Fourteenth.'") (quoting *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 418–19 (6th Cir. 2015)). On this record, Sears is unable to show that it was objectively unreasonable for Parsons to deny medical treatment and thus fails the Fourth Amendment standard.[33]

A claim for inadequate medical treatment based upon a serious medical need under the Fourth Amendment requires evaluation of four factors: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Esch*, 699 F. App'x at 515 (quoting *Ortiz v. City of Chicago*, 656 F.3d 423, 430–31 (7th Cir. 2011). The Plaintiff must also show that the Defendant's "conduct caused the harm of which [the Plaintiff] complains." *Id.* A review of these factors requires an analysis of the totality of the circumstances, analyzing the facts 'from the perspective of a reasonable [official in Defendant's position,] rather than with the 20/20 vision of hindsight.'" *Esch*, 699 F. App'x at 515 (quoting *Darrah v. City of Oak park*, 255 F.3d 301, 307 (6th Cir. 2001). A serious medical condition is apparent when the symptoms evidence a need for medical attention that is "so obvious

---

[33] The Eighth Amendment standard includes both an objective and subjective component. *Esch*, 699 F. App'x at 514. Because Sears fails the objective Fourth Amendment standard, he would also fail the like Eighth Amendment standard by not fulfilling its objective component. Sears nowhere claims that anyone at the jail had actual (subjective) awareness of his condition or any resulting risk. This would foreclose that prong under the typical deliberate indifference rubric.

26

that even a layperson would recognize" the need for help. *See Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

With that backdrop in mind, Sears's argument on this count boils down to linking Parsons's conduct with the previously discussed conduct of the officers. In other words, Sears claims that the harms flowing from Parsons's alleged failure to render medical care was the excessive force alleged in Count VII. *See* DE 89 at 3 ("[Parsons] failed to recognize that Sears was experiencing seizure, she failed to render aid, and she failed to intervene. This failure to intervene and provide proper medical treatment resulted in unnecessary pain that could have been prevented.")[34] Because Keeney and Pitman used reasonable, *i.e.*, not excessive, force, Plaintiff fails to tether Parsons's conduct to any cognizable harm. The claim's stringent causation requirements demand that Sears show more.[35]

---

[34] *See also id.* at 7 ("The video evidence shows that Plaintiff was having a seizure, was disoriented, and unable to comply with the officers. Nurse Parsons not only failed to recognize that the Plaintiff was experiencing a seizure, she told the officers she would stand on the Plaintiff's leg. Since any use of force was unreasonable, this could only amount to punishment – in direct violation of the Eighth Amendment.") This does not compute as a matter of logic or claim element.

[35] Sears does not advance an alternative, independent harm flowing from Parsons's conduct. However, Sears does submit the opinion of his treating physician, Dr. Toufic Fakhoury. Dr. Fakhoury's report gives context to Sears's history of complex partial seizures and the possible postictal effects. DE 89-1 at 1–2. Dr. Fakhoury concludes his report by noting that confrontation or restraint "may" exacerbate Sears's symptoms. *Id.* at 2. However, Dr. Fakhoury's report does not establish causation between the events on September 10th and any future recorded harm; Sears also concedes as much while obliquely claiming the Defendants had the burden to establish the absence of causation. DE 89 at 9 ("Although [Dr. Fakhoury's report] does not directly touch on the causation element regarding Nurse Parsons, it is important to note that the Defendants either refused or failed to depose Dr. Fakhoury.") Despite this concession, Sears argues a lay jury could find medical causation on the record he has developed. *Id.* However, Sears's bare claim that his seizures are self–evident, in light of the record and the video evidence, is not enough to prove that the condition was so obvious to avoid the causation requirement. For a factual question outside the lay understanding of jurors, the law requires expert testimony. This plainly extends to the § 1983 context. *See, e.g., Alberson v. Norris*, 458 F.3d 762, 765–66 (8th Cir. 2006) (holding that, in § 1983 context, if medical question "is not within the realm of lay understanding," *i.e.*, concerns a

Regardless of this fatal flaw, Sears argues that Parsons had a duty to recognize the postictal effects of a seizure and accurately diagnose the seizure Sears suffered. Parsons's failure, according to Sears, to intervene and treat him was inadequate medical treatment in light of his severe medical condition. Because Sears fails to establish causation, the Court declines a full examination of the *Esch* factors. However, a cursory examination shows that Sears would not be able to satisfy all factors. For example, as to the first *Esch* factor, Sears must show that the officer has notice of the condition. However, Sears's analysis of the video evidence is, again, an attempt to give a Defendant prescience as to or 20/20 vision of events that transpired within mere moments.[36] Furthermore, Sears's analysis shuts the door against other possible conclusions that could be drawn from an individual suffering from the postictal effects of a seizure. These postictal effects, as described previously, may mimic behavior exhibited by a recalcitrant detainee. Parsons's access to information, in the moment, was limited and it was reasonable for her to conclude that Sears's combative nature did not originate from a seizure. Parsons had come to work well after Sears's earlier trouble. Moreover, Sears does not claim that he was requesting any medical treatment. In fact, Sears argues only that the next step after proper taxonomy of his status was the cessation of force. *See* DE 89 at 7. Sears provides no other alternative treatment nor provides any evidence of

---

matter regarding a prisoner's "sophisticated medical condition," then "expert testimony is required to show proof of causation.").

[36] Sears's own analysis begins by highlighting the events in the holding cell, out of view of the Defendants. *See, e.g.,* DE 89 at 2–3 ("Sears was in a cell with other inmates. He can be seen on video touching another inmate's foot. Sears then collapsed onto another inmate. This behavior is consistent with Sears experiencing yet another seizure while in custody. And, once again, despite the fact that Sears was suffering from a seizure, [Defendants] picked Sears up off the floor, removed him from the cell, and took him to the ground.") Equipped with this knowledge, Sears holds the Defendants responsible for their failure to recognize that Sears suffered a seizure in the cell. This is a perspective that is not shared by the Defendants and it is unreasonable to ask them to assume the panopticon. The record and the video evidence only support the conclusion that Parsons and the other Defendants first saw Sears when the officers were attempting to remove him. Again, Parsons began work between the incidents.

what Parsons should have done. Finally, there is no evidence that the *postictal effects* of the seizure are plainly obvious. The complex partial seizures that Sears suffers do not, on this record, have the tell-tale signs commonly associated with grand mal seizures.[37] Count VIII claim falters, to the extent it in any way involves federal law, at the Rule 56 hurdle and, therefore, summary judgment is appropriate.

### 4. Supervisory Liability (Counts X and XI)

Sears claims that Swartz and Moss should be liable as supervisors. Defendants respond to this allegation arguing that there is no proof that either of them was present during the complained of incidents and that the Plaintiff has not met the stringent causation requirements. DE 81 at 18. Sears, in response to the motion for summary judgment, does not directly address Defendants' arguments, and merely realleges the failure to train claim. *See* DE 86 at 15.[38]

---

[37] *Compare Epilepsy Types & Seizures: Generalized & Partial*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/17636-epilepsy (last accessed Aug 25, 2020) ("Complex partial (impaired awareness): Typical Symtoms [sic]: Staring, unresponsiveness; automatisms such as lip smacking, chewing, fidgeting, and other repetitive, involuntary but coordinated movements"), *with Grand mal seizure – Symptoms and causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/symptoms-causes/syc-20363458, (last accessed Aug 25, 2020) ("Grand mal seizures have two stages: [1] Tonic Phase. Loss of consciousness occurs, and the muscles suddenly contract and cause the person to fall down. This phase tends to last about 10 to 20 seconds. [2] Clonic phase. The muscles go into rhythmic contractions, alternately flexing and relaxing. Convulsions usually last one to two minutes or less.")

[38] Sears responds to the Defendants' arguments by restating the standard for a failure to train claim and then realleges a bare allegation of failure to train. The Defendants read this response to be a failure to respond to the arguments made in the individual capacity of Swartz and Moss. DE 92 at 3. The Circuit is clear: "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting sources). The apparent lack of response may make Defendants' argument fatal to, at least, the individual capacity claims. In the alternative, holding Swartz and Moss individually liable "for their alleged failure to adequately train employees . . . 'improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.'" *Harvey v. Campbell Cty, Tenn.*, 453 F. App'x 557, 563 (6th Cir. 2011) (quoting *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008)).

To bring a claim for inadequate training or supervision, a plaintiff must show "that: 1) the [municipality's] training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the [municipality's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006). Deliberate indifference may be shown by "either (1) 'prior instances of unconstitutional conduct demonstrating that the [municipality] had notice that the training was deficient and likely to cause injury but ignored it' or (2) 'evidence of a single violation of federal rights, accompanied by a showing that the [municipality] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 836 (6th Cir. 2019) (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2012)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the Cty. Comm'rs v. Brown*, 117 S. Ct. 1382, 1392 (1997).

As to the particular supervisor, "[t]here must be some conduct on the supervisor's part to which the plaintiff can point that is directly correlated with the plaintiff's injury." *Id.* (quoting *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013). The supervisor must have "d[one] more than play a passive role in the alleged violations or show mere tacit approval of the goings on[.]" *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). And, critically, there must be a causal connection between the supervisor's improper execution of his job function and the plaintiff's injuries. *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016). Under § 1983, allegations of "supervisory liability by themselves . . . will not do the trick. Instead[,] . . . the supervisors must have actively engaged in unconstitutional behavior to be liable[.]" *Mitchell v. Hininger*, 553 F. App'x 602, 607 (6th Cir. 2014) (internal quotation marks removed). "At a

30

minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley*, 729 F.2d 416, 420 (6th Cir. 1984) (citing *Hays v. Jefferson County*, 668 F.2d 869, 872–74 (6th Cir. 1982)). Mere inaction or awareness of misconduct does not suffice. *Peatross*, 818 F.3d at 241 (6th Cir. 2016); *Leary v. Daeschner*, 349 F.3d 888, 902 (6th Cir. 2003). Rather, "[t]here must be some conduct on the supervisor's part to which the plaintiff can point that is directly correlated with the plaintiff's injury." *Peatross*, 818 F.3d at 241 (quoting *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013)).[39]

Sears's argument against Swartz and Moss necessarily fails when, as previously discussed, there is no underlying constitutional violation. Notwithstanding this deficiency, Sears does not point to any specific conduct by Swartz or Moss to satisfy individual liability standards. On the record, Sears has not shown that they were present during the incidents or authorized the specific conduct. Therefore, no reasonable jury could find Swartz or Moss liable. Summary judgment in favor of the Defendants on Counts X and XI is appropriate.

### 5. Official Capacity Claims (Counts XII and XV)

The amended complaint, according to the Defendants, should be construed as to include only official capacity claims. DE 81 at 2. The Court disagrees, but Counts XII and XV do purport to impose liability on the involved entities, thus requiring an official capacity analysis. Defendants argue that Sears has advanced no county policy or custom that caused the complained of harm. *Id.* Sears, relying on his expert's opinion, argues that the officers' use of force "shows either a problem of training or a problem of indifference." DE 86 at 15; Harmening Dep. at 85. Thus, according to

---

[39] Relatedly, a § 1983 failure-to-train inquiry also considers whether "there is a causal connection between the defendant's wrongful conduct and the violation alleged." *Peatross*, 818 F.3d at 242 (citation omitted).

Sears, there is a direct causal link between a lack of training and the complained of harm. DE 86 at 15. Defendants argue that, without an underlying violation, there can be no liability imputed to any Defendant. Furthermore, Defendants argue that Sears's allegations are bare and nothing more than unsubstantiated claims of improper training void of rigorous standards of culpability and causation.

To begin, respondeat superior is not a basis for county liability under § 1983. *Jackson*, 925 F.3d at 828. "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" *Id.* (internal quotation omitted). There are four ways to make this showing: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (internal citation omitted). This same standard applies to any remaining official capacity claims as to the individual Defendants. "Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself, and thus a successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability stated in [*Monell*]." *Kraemer v. Luttrell*, 189 F. App'x 361, 366 (6th Cir. 2006)**.**

Also, there can be no § 1983 municipal liability without an underlying constitutional violation. *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). Here, having found no constitutional violation by the PCDC Defendants, Pulaski County cannot bear any § 1983 liability. But, even if the officers used excessive force during the incident in question, Plaintiff has failed in other ways to make the requisite showing for liability. Sears's bare allegation is supported only by Mr. Harmening's opinion. Harmening Dep. at 85 ("[I]t's my opinion that either or – either

[Pitman II and Bates] were not properly trained, or they were just simply indifferent to [Sears's] condition"). This claim is purely speculative and does not point to deficient training. Mr. Harmening admits, however, that he had no evidence to conclude that the PCDC Defendants did not meet training requirements and admitted that his opinion was limited *only* to Pitman II and Bates. Harmening Dep. at 65–66 ("I have no evidence that they have not met [training] requirements."); *id.* at 86 ("My opinions only relate to Pitman and Bates"). With no ammunition, Sears's claim misses the Rule 56 mark.

This same analysis applies to Corhealth. Sears's claim against Corhealth is not a direct claim; Sears does not allege that Corhealth directly contributed to harm. Instead, he wishes to hold Corhealth liable because of Parsons's actions. *See* DE 89 at 8–9 ("Nurse Parsons' [sic] decision not to provide necessary medical treatment to Plaintiff was objectively unreasonable. Regardless of [what standard applies], he has raised a genuine issue of material fact against the Corhealth Defendants."). Corporate defendants cannot be held liable under § 1983 under a theory of respondeat superior or vicarious liability. *See Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (extending the municipal corporation holding of *Monell* to private corporations). To succeed on this claim, then, Sears must satisfy the same *Monell* liability requirements he has failed to support against the PCDC Defendants.

Sears relies on *Torrens v. Jacks*, No. 3:19-CV-00434, 2019 WL 5261107, (M.D. Tenn. Oct. 17, 2019) for the proposition that his claim should proceed. However, *Torrens* allowed a claim against an employer to proceed because the plaintiff there sued the employer "directly." *Id.* at *3. Even if the Court were to construe this argument as alchemizing his claim against Corhealth into a direct claim, the claim would fizzle. To satisfy a direct attack against a medical employer such as Corhealth, a plaintiff must base its claim "on some policy that caused a deprivation of

[Plaintiff's constitutional right.]" *Starcher v. Correctional Medical Systems, Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001). Again, the lack of an underlying constitutional violation proves fatal. Moreover, Sears does not point to nor provide evidence of a specific policy of Corhealth causally leading to injury. Thus, summary judgment in favor of Defendants on Counts XII and XV is appropriate.

Finally, Sears's remaining federal claims, if they can be construed as official capacity claims against the individual Defendants, fail for the same reasons. Without an underling constitutional violation or evidence of a deficient policy, practice, or procedure, these claims cannot proceed.

### B. State Claims

As to the state-law claims, the Court, having found all federal claims deficient on Rule 56 review, finds dismissal without prejudice of the remaining claims appropriate. Given the common factual field, the Court, under 28 U.S.C. § 1367(a), has supplemental jurisdiction over the Kentucky claims. However, after a "district court has dismissed all claims over which it has original jurisdiction" the exercise of supplemental jurisdiction is not mandatory. 28 U.S.C. § 1367(c). The Court's discretion in this area is broad, but "bounded by constitutional and prudential limits on the use of federal judicial power." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996) (hereinafter *Musson*); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). Specifically, the Court must account for "judicial economy, convenience, fairness, and comity" concerns. *Carnegie-Mellon Univ. v. Cohill*, 108 S. Ct. 614, 619 (1988). "Depending on a host of factors, then—including the circumstances of the particular case, the

nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims—district courts may decline to exercise jurisdiction over supplemental state law claims." *City of Chicago v. Int'l Coll. of Surgeons*, 118 S. Ct. 523, 534 (1997). If all federal claims are dismissed pretrial, "the balance of considerations usually will point to dismissing" or remanding state claims. *Musson*, 89 F.3d at 1254–55.

The Court sees nothing, on this record, to overcome the general dismissal presumption. First, Kentucky's recognition of the difficulties inherent in parsing the state's qualified official immunity jurisprudence and the "subjective aspect" inherent in the Commonwealth's doctrine— but absent from the federal qualified immunity rubric—provide additional comity-based dismissal drivers. *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001); *see Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014) ("The question of when a task is ministerial versus discretionary has long plagued litigants and the courts.").[40] Second, § 1367(d) "supplies a tolling rule" for statutes of limitation that state courts "must" apply. *Artis v. District of Columbia*, 138 S. Ct. 594, 599 (2018). Thus, the Court foresees no limitations-based difficulties that would favor retaining jurisdiction federally. *See id.* at 605 ("In § 1367(d) Congress [provided] for tolling not only while the claim is pending in federal court, but also for 30 days thereafter. . . . [T]he added days give the plaintiff breathing space to refile in state court.") Given the presumption and these factors, the Court declines to exercise jurisdiction over the remaining state-law claims. *See Frodge v. City of Newport*, 501 F. App'x 519, 534 (6th Cir. 2012) (affirming district court's dismissal of state law

---

[40] *See also Blaha v. Hetfield*, 127 F.3d 1102 (6th Cir. 1997) (unpublished table decision) ("We are unable to say with assurance that Michigan courts would analyze Michigan law as did the district court[.] . . . In light of the unsettled Michigan case law, the district court improperly exercised jurisdiction over the state law trespass claim[.] . . . The court would have been better advised to dismiss that claim without prejudice."). Notably, the fact that a "claim raises a novel or complex issue of State law" is, itself, a sufficient—*i.e.*, not dependent on dismissal of the claims providing original jurisdiction—basis to decline supplemental jurisdiction. 28 U.S.C. § 1367(c)(1).

claims after granting defendants summary judgment on "[p]laintiffs' § 1983 claims for false arrest, excessive force, and supervisory and municipal liability").

## IV.   CONCLUSION

For the above reasons and on the stated terms, the Court **ORDERS** as follows:

1. The Court **GRANTS IN PART** DE 81 and 84;

2. The Court **DISMISSES** Plaintiff's federal claims, in total, **WITH PREJUDICE**;

3. The Court **DISMISSES** Plaintiff's state-law claims[41] **WITHOUT PREJUDICE**;

4. Given the Court's declination of supplemental jurisdiction (and dismissal of all claims) the Court **DENIES** DE 82, DE 83, and DE 97 **WITHOUT PREJUDICE**; and

5. The Court will enter a separate judgment.

This the 9th day of October, 2020.

Signed By:

**Robert E. Wier**

**United States District Judge**

---

[41] The defense raises significant elemental faults in the various state claims. Thus, Plaintiff offers no expert proof on, *e.g.*, the medical (standard of care) or causation issue (a likely requirement for medical negligence) or the degree of emotional distress inflicted (a likely IIED requirement). Further, Plaintiff does not explain how Parsons's words could be an assault under Kentucky law. The Court has many doubts about these claims, but the courts of the Commonwealth may, if Sears goes there, resolve those under applicable state standards.